Rob Wendt, Charleston, South Carolina, and I represent Shelley Cannon, the claimant in this matter. Before I begin on the merits of the case, I would like to make a brief clarification of the record, if I may. The Commissioner has made a number of representations about the facts of the case, and we have disagreed with that and put that in our reply brief. But there is one clarification that I think is important because it colors the case. On page 2 of the Commissioner's brief, it's stated that Ms. Cannon managed about 100 employees, and that's not correct. She was the preschool director for a Baptist church, and according to the record, she supervised six people during that program from Monday through Friday. And then on Sunday services, when they ran the nursery, she supervised about nine people while the parents were in the services. She was a high school graduate, although she did take some college courses for about a year. But she also, notably, only earned about $18,700 a year. That's the most she earned doing this work. So she's just not a high-powered managerial type. She was just a regular person running a program, worked very hard for very little money, and was very stressed out by that. And there are two issues before the court today. First of all, whether the evaluation by the ALJ of the opinion of the treating psychiatrist who was a board-certified specialist, whether that was done properly, and whether the ALJ failed to follow the procedures under the regulations for the evaluation of medical opinions that applies to this case, the old medical opinion rule. And did the ALJ follow the holding and dowling from this Court about the need to address all of those factors? The other issue, of course, is whether the ALJ properly evaluated Ms. Cannon's subjective symptoms. Now, the underlying error for both of these issues is whether the ALJ built an accurate and logical bridge between the facts of the case and the ALJ's conclusion. Now, the ALJ decision has lots of facts. The record is described in a pretty good bit of detail. And then there are conclusions. But what we're sorely lacking here in the ALJ decision is an explanation of how the ALJ got there. And that's really the nub of this case. It frustrates meaningful judicial review. And under this Court's holding and dowling, that very fact warrants a remand for an explanation. Now, it's important, I believe, to look at the theory of this case. Why do the facts support a conclusion that Ms. Cannon was disabled under the Social Security regulations? Why did the dowling case in Ms. Arica's case change this case? You've indicated that the correct legal standard that was applied in this particular case. How does that change this case from the way in which the ALJ conducted this review? Well, what the ALJ... The ALJ has just not explained a number of different conflicts in this record. I'm speaking to the law. How has the law changed? Oh, well, the law really has not changed that much under the new regulation. I'm sorry, I misunderstood the question. How has dowling and ARSA changed those two cases? Did they change at least the legal standard or articulate it or indicate it differently? Mostly, it's an articulation of what the regulation said, which requires the old regulation, which is the operative regulation in this case. It says that the adjudicator must address, the commissioner must address all opinions and give an explanation that makes it clear to other reviewers of the decision of basically how the ALJ... Well, here we get to substantial evidence and the failure to explain how we got to this point. The ALJ was required... The standard that applied, was that incorrect or was it correct? The ALJ's standard? Yes, the legal standard that the ALJ applied when considering the treatment psychiatrist's opinion. Was that a correct standard? He did not address all the factors. The factor he did address, that was the correct standard. And what he addressed was the consistency of the opinion with Dr. Beal's own records and with the other evidence of record. And that was flawed because those findings of fact are not supported by the record. The rest of it, he just doesn't explain. And there are numerous other factors, in particular, the factors dealing with Dr. Beal's status as a treating psychiatrist who treated Ms. Cannon a lot over a long period of time. Was the ALJ required to specifically enumerate each of those factors in considering Dr. Beal's testimony? Well, he was, if those factors are important to the outcome of the case, and the court cannot determine exactly how the ALJ reached that conclusion. And in this regard, and I would like to go back because I think it's important to look at what is the theory of disability in this case, and why does that opinion matter? And why did it matter that the ALJ did not articulate the reasoning behind these factors? Well, first, Ms. Cannon was disabled because at step five of the sequential evaluation, because the ALJ found that she could not return to past relevant work. Then we moved to step five. And at that point, the issue is whether the claimant is able to sustain the, in this case, the mental demands of work on a regular and continuing basis, eight hours a day, five days a week. That's the legal standard. There are two issues under that particular theory. One is the vocational expert testified that an individual, that there would be no jobs at step five of the sequential evaluation in the national economy to an individual who was off task more than one hour a day. And also, there would be no jobs at step five of the sequential evaluation for an individual who is absent from work more than two days a month on a regular basis. And that's really critical because when we look at this record, what we see are a number of severe symptoms of mental illness which are persistent. And just like most cases involving these mental illnesses, the patient has good days and bad days. It's an up and down. It's not a straight line, the degree of severity. But what is clear is that the mental illness was severe, and that was part of Dr. Beal's opinion. And he also stated that she would require lifelong aggressive treatment to prevent worsening of her state and to reduce the number of hospitalizations required. And that's exactly what happened. She underwent extensive counseling. She underwent not conservative, but actually aggressive treatment with the TMS treatment. She was considered for electroshock treatment, and she was managed on lots of medications which were changed when her symptoms did not appropriately respond. So one question that comes up right away is, how could anyone sustain work on a regular and continuing basis, eight hours a day, five days a week, when they're undergoing that much treatment? In and of itself, not to mention the episodes of increased symptoms, which she clearly had with these ups and downs, how could she not miss too much time from work? The other issue, one of the many symptoms that she displayed, and which are well documented in this record, are her affect and mood. That is, she's always tearful and crying. And she complained that she had crying spells all the time, and that when she went for treatment, and she testified to this and also indicated in a function report form at Administrative Record 204, I believe is where that's found, that when she would return from her rest of the day and couldn't get anything done. Now you have to ask the question, how could a person who is crying all the time in all these encounters, every single doctor she sees notes that she's crying or is tearful during these encounters. I guess in following you, I'm trying to understand, we could go back and forth and say that question, how could we believe that? But I thought your case would turn upon how the ALJ handled this treating position of the psychiatrist's opinion, in the first instance as to whether the legal standard, and then secondly regarding the medical record as to whether it is supported by substantial evidence in the case, and why he would have a different opinion that's inconsistent from Dr. Fields. I mean, you ask, you have to ask yourself, that's not going to help you one bit, but I can see we can go back and forth, but the question is, is what did the ALJ do wrong in this case that would entitle you to a rehearing, remand, or reversal? Yes sir, and Judge Winn, you're absolutely right. Which one of those are you addressing right now? Well, it's not for this, well it is the legal standard, and it also is But you agree that, you're not contesting the fact that ALJ did not find that the psychiatrist's testimony to be controlling. Oh absolutely, and it's not controlling, it shouldn't be found controlling, there's other evidence that... That doesn't end it, so now he then has to determine how much weight he will give to this testimony by virtually of looking at the factors. As I understood your brief, you were complaining that under Dowin and Arrakis, that he had to really go through those factors. I don't know to what extent he had to go through it, but he didn't go through it sufficiently in applying the proper regulatory factors here, which is a different type of position than if you only pick out one or two of them. Well, agreed, I mean this is a procedural case, and the procedure is extremely important because the court can't conduct judicial review unless these procedures are followed, and that is the holding of this court in the Dowin case. He gave the treating psychiatrist physician opinion a little weight, which you can do, but you got to go through the factors to do it, and the Well, and he clearly did not, your honor, and the reason is that there's evidence which we have pointed out that contradicts his projection of the treating doctor's opinion, and he's failed to explain how he came to this conclusion that the treating physician's opinion... Well, I guess it determines on how he looked at those factors. Right, right. It's not just he clearly did, and there's evidence to do it. You have to look at the factors, and your answer would articulate which of those factors he did not. Right, and the factors that the factor he did consider is not supported by substantial evidence. The factors he did not consider are critical because according to the commissioner's regulation, the treatment relationship, the frequency of treatment, the purposes of the treatment itself, and the specialization of the medical, the person giving, the doctor making the opinion, those are all critical factors in weighing the evidence and reaching a conclusion. An administrative law judge is not a medical expert, and this is one reason why we have these regulations. An administrative law judge is trained legally, and while the judge has to try to understand medical issues, in the end, the judge can't encroach on that area. That's why the law requires the commissioner to hire a psychological consultant at the initial level if there's a mental impairment, and that's why they scheduled consultative examinations. So the administrative law judge's explanation of how he got from A to B is critical in this case from a procedural point of view. The other factors, just to go back to why the ALJ's assessment of the consistency factor is not supported by substantial evidence, there's lots of evidence here, which we've cited in the brief, about the various findings on clinical examination that contradict the judge's finding. There are significant findings here about all of these severe symptoms on examination. And I think that unless there are other questions, I'll rest and reserve my time to respond. Thank you, Mr. Ware. Ms. DiDomenico? Good morning. May it please the Court. Your Honors, the District Court rightly affirmed because substantial evidence supports the ALJ's decision in this case. The ALJ fully appreciated that Ms. Cannon's longstanding mental impairments impacted her work-related abilities. In fact, the ALJ agreed with Ms. Cannon that she could no longer perform skilled, stressful work as a determined that Ms. Cannon could work, but with considerable mental restrictions. Simple, routine, repetitive work, no fast-paced production requirements, only simple work-related decisions, few, if any, workplace changes, and only occasional interaction with the public. The legal issue here, at least initially, is the question of how the ALJ got to all that you just said. And to get there, there was a treating psychiatrist named Dr. Beal. He gave a lot of testimony. ALJ basically ended up giving a little weight to that opinion. First thing he said, it's not controlled. The opposing counsel doesn't disagree with that. It doesn't have to be controlled to meet to that level. But that doesn't end it. If it's not controlled, then he has to he then has to go to those factors. And the question here is, did he adequately explain, in light of those factors, the level of weight in which to accord Dr. Beal's testimony, which would lead to all of those conclusory things that you just gave us? Your Honor, the ALJ did everything that was required, and that's why the district court That's a wonderful conclusion. And I'm asking you to deal with the issue in the case. I got it. We can say that he did everything he could. He was wonderful. But at the end of the day, the question comes, did he articulate and the factors that are necessary, having determined that he is not controlling, which he can do. No one disagrees with that. But he's got to figure out the weight. And to come to little weight, is that supported by his articulation of an explanation of those factors? And if it is, then address the factors and how you contend it is sufficient for him to have come there. Certainly. If you look at the decision itself, the ALJ meaningfully considered all the relevant factors. And before I go there, I just want to point out that in Dowling, the court said the ALJ is not required to set forth a detailed factor by factor analysis. That will come to the conclusion that what you're saying is he doesn't have to go through every one of them. But something has to happen beyond just, you know, I've looked at it and think it's okay. So tell me, how do we get there? So on page in joint appendix, page 18, we have a paragraph addressing Dr. Beal's opinion. The ALJ addressed consistency and supportability when he explained that Dr. Beal's opinion was not consistent with his own treatment notes. And the ALJ meticulously discussed those treatment notes throughout the record. And just briefly, I'll point out that the treatment notes showed that Ms. Cannon was reporting to Dr. Beal significant improvement in her symptoms. She was denying medication-related side effects. She was denying suicidal ideations consistently. She was telling Dr. Beal she was making progress in therapy. She was also reporting that TMS treatment was significantly reducing her symptoms. So that's one factor. It was inconsistent with his own treatment notes and was not supported. The ALJ also explained that Dr. Beal's opinion was inconsistent with the medical evidence of record. And here again, when you look at the ALJ decision as a whole and the pages before the ALJ comes to this analysis, the ALJ meticulously discussed the evidence that was inconsistent with Dr. Beal's opinion. That evidence included the fact that Ms. Cannon had no psychiatric admissions after her alleged onset date, that her treatment consisted of medication management, psychotherapy, and TMS treatment, which was highly effective by her own reports in reducing her symptoms. We had the benefit of three expert opinions, two state agency psychological consultants, and then a person, a psychiatric examiner, who met with Ms. Cannon. And all three of those experts concluded that Ms. Cannon could perform a range of simple work. And also, the record showed that Ms. Cannon elected to discontinue some effective forms of treatment. She stopped TMS therapy and also discontinued her psychologist. So there was ample evidence in this record that was inconsistent with Dr. Beal's opinion. The ALJ also addressed the other relevant factors in our regulations throughout the decision. He discussed the nature and the extent of the relationship when he mentioned that Ms. Cannon was seeing her psychiatrist every three weeks. Then he discussed that she had been seeing Dr. Beal for medication management since at least 2015. Then the ALJ meticulously discussed over two and a half years of medication management visits with Dr. Beal. So all of that analysis shows that the ALJ meaningfully considered the nature, the extent, the examining relationship, how frequently they saw each other. And the ALJ also addressed specialization. Again, he discussed that Ms. Cannon was seeing her psychiatrist every three weeks. He talked about the medication management with Dr. Beal. And then when he analyzed her opinion, he discussed that Dr. Beal was treating Cannon since at least 2015 for her mental impairments. So the ALJ certainly recognized the specialty of Dr. Beal as well. And that's why the ALJ certainly conformed to the requirements of Dowling by providing meaningful consideration of the regulatory factors. Is it enough to recognize it? Does it not require him to explain? I mean, take for instance the situation where there is some improvement that the record shows she's making. She's having some good days. And then that indicates, well, she can do a job. Well, where does he explain that? I mean, how do you explain that as a basis for that she's having some good days that she's incapable of employment? Or can you simply just recognize it and that's the end of it? Well, Your Honor, it's a very fact-specific inquiry based on this particular case. And what's required of the ALJ as the fact finder is to articulate substantial evidence to support his findings. That's the issue here. Could a reasonable mind reach the conclusion that the ALJ did here? And certainly as a district court found, yes. How do we know that if you don't explain it? If all you do is say, I recognize it, do we then read between the lines and figure it out? Your Honor, this court doesn't require decisional perfection by an ALJ. What matters is if there's a logical bridge between an ALJ's fact-finding and the conclusion and enough discussion of the evidence within the decision. In other words, we do read between the lines. Certainly, Your Honor, because we're looking at the ALJ's decision as a whole. I guess those two cases, they pretty much say you should not, and Dowling, you should not have to read between the lines of an ALJ in order to get a consideration of the regulatory factors. Well, I think that what I meant to say is, is there meaningful consideration? Like Dowling says, it doesn't require a factor-by-factor articulation. What the court said was, can we look at this decision and understand whether those factors were considered? And we have that here. We have enough of the ALJ's articulation for this court not to have to read between the lines. The court can look and see that the ALJ discussed psychiatric treatment every three weeks. That medication management was provided by Dr. Beal. Think about the worst case scenario here from your perspective. Even if we did find that maybe he didn't do enough, what do we do? Send it back and he looks at the record and then just put a few more words in there or maybe have some more evidence if necessary. But it wouldn't be a big fix to it, would it? Well, Your Honor, of course, our position is that the ALJ certainly did enough for this court to engage in meaningful judicial review of the ALJ's conclusions. That would require us reading between those lines you just laid in front of us. And Dowling said we shouldn't do that. Well, Dowling says that on the other hand, Your Honor, that express consideration of the factors is not required. What's required is apparent. There wasn't even a hint of consideration in Dowling. And that's just simply not the case here. And that's what the court said. The court couldn't even reach any idea whether the ALJ had meaningfully considered those factors because there wasn't a hint of it. We have that hint here. So the court, even if I misspoke about reading between the lines, what I meant was, is there enough- I'll let you do that and I apologize for that. I'll let you do that and if you use the words and you didn't know where I was going, then I won't hold that against you. I appreciate that, Your Honor. But what I was trying to get at is, in our cases, what an ALJ has to do is provide sufficient articulation for the court to understand fact-finding. And that's what the ALJ did here. We have a compendium of evidence, substantial evidence, which is not high, as the Supreme Court has made clear. It's more than a mere scintilla and less than a preponderance. When you look at the ALJ's decision as a whole and his meticulous discussion of Ms. Cannon's treatment history, the efficacy of her treatment, her own statements to her providers, and that's a point I'd like to talk about briefly. You know, Your Honor- Before you pivot to something else, you've talked about, I think you've done a great job of explaining how they came to the conclusion as to why they gave little weight to Dr. Beale. You've done that. But I'd like to ask you something that I think, to me, is the core of the case, and that is, there's no evidence she was ever relieved of her diagnosis, correct? Correct. All right. And what is her diagnosis that, as you can see, renders her unable to do her job? Well, according to Dr. Beale, he said her most significant impairment is depression. But not just depression. What type of depression? That's very important in this case. What type of depression? Well, the ALJ found severe- What did they find? I think in the record. What is it? What was it? It was depression with suicidal ideation and anxiety features and also attention deficit disorder. Those are the two severe impairments the ALJ found. But those are the results of the impairment. But what did he label as the type of depression she had? I'm not sure if I understand your- Well, the key is that the type of depression was endogenous depression, right? That's what the record says. It's undisputed. N-D-O-G-E-N-O-U-S. That's significant. You know what that means? What kind of depression it is? No, Your Honor. It's the depression that has no external triggers. Endogenous means that it's internal. It's very difficult to treat because exo means some other things like, for example, death in your family, for example. Or you have a situation. It could be drugs or something like that. It could be a romantic relationship. All those things are triggers of those things. And therapy tries to help you deal with those triggers. Well, next time someone does that to you. But for basically this kind of depression, it is almost sui generis. It's internal. It means you just start crying. You just for no reason. Otherwise, if you notice in the record is that she had a very stable home and family. It's one of those things that you have every reason to be happy. But you're not. Because it's internal. And you don't have these triggers to say if you get external disease. And look, if you stop going around these people. If you stop doing that. That's important in this case. And you talk about the medication she was taking. That's the medication that's undisputed in this record was necessary to keep her going. And taking these drugs and this medication to treat yourself is the thing that makes it somewhat unable to deal with it. To concentrate in those things. So I don't see anything in the record that disputed Dr. Beal's conclusion that these things, they have no triggers. They just come and they last. And she's honest. I think she would be disingenuously. No, every day I feel like I want to cry. No, but I don't know when it is that I do want to cry. That's the evidence. It's undisputed. What you went down is, well, I don't know about this. Maybe the days you don't cry, you could work. Oh, you know, as long as you're doing something that's not stressful. The only thing that the difference. No, go ahead. You're about to say something. Well, Your Honor, I would point out the record shows that Ms. Cannon has been depressed since the age of 18. She has a long history of psychiatric care. The ALJ acknowledges that. But this is also a person who successfully performed skilled, stressful work despite her depression for 10 years. And in the beginning of the argument, counsel suggested that she wasn't managing 100 employees. And I would just point out that the transcript at page 380, I took that from the transcript where she said Dr. Beal recorded that she was managing 100 employees. So the issue is not that she doesn't have depression. The ALJ certainly acknowledged that. And this is a person who was successfully employed for 10 years with the same impairment performing skilled work. And what the ALJ... That's the problem, counsel. You have you punish people who persevere almost. She did. She pushed through. It's unbelievable. You know, at 19 years old, she just sort of given up and just balling a knot and did nothing. Oh, that means she... No, she's not. She pressed through for 10 years. She's productive. She's doing things. But at some point, you get to the point where the body and the mind just can't endure. And so you say, oh, you did it for 10 years. That means you certainly could do it another 10 years. It's contraindicated in terms of her diagnosis. And so we talk about the science. You know, you just pick through that. The only thing that separates us from animals is our minds. And if your mind is something in the sense that in terms you can't control in terms of depression to the point where you get that, it's just... I don't know. It's... I think that's the question about... I mean, you know, Dr. Beale is deceased now. And so he can't speak for himself. But he treated his lady since 2015. And it seemed to me that would go to her credibility in the sense that she did persevere. And it did these things. And... But anyway, go ahead. I don't want to... You go ahead. Well, you know, one, as the court knows, the issue is whether the ALJ could have reached his fact finding, whether substantial evidence supports it. So the fact that a different fact finder would reach a contrary conclusion on the same record isn't what's at issue. It said, did the ALJ identify substantial, not high evidence to support his fact finding? And he discussed that Ms. Cannon, despite her complaints of never... In her disability paperwork and hearing testimony that she never left her bed, that she cried all day and that she was watching reruns only on a good day. She was telling her therapist that she was attending weekly art classes. She was able to push herself to do things as needed. She was attending weekly Weight Watchers. She was enjoying Christmas and with her family. She visited colleges with her daughter. She did light exercise several times a week. So there was a lot of conflicting evidence. And that's why the ALJ, as a reasonable fact finder in the case, articulated enough meaningful discussion to support why, as he, as a fact finder, found that Ms. Cannon could no longer perform skilled work, but based on the record before him, could perform a much more narrow range of simple work. Where in the record did the hearing officer look at the fact that she was... She underwent transcranial magnetic stimulation? And how severe that is. That's one of the severest cases of depression. You don't get that in normal depression. That's a high level, except that he considered that fact that she, right? What weight is it ever is that he looked at that? So the ALJ's discussion of the TMS treatment is on JA-17. But you concluded that she was getting better from it. Yes. I'm talking about the fact that she was... That alone gives you the level of severity of her depression. You don't give transcranial magnetic stimulation to someone who has a base, no such thing as a normal depression, but more of a continuum on the continuum of the spectrum. If you talk about a spectrum, that would be way on the far end spectrum of depression. For that, what evidence was... And tell me, what did they say? Seemed like, did they do what you did? Say, oh, she had it and seemed like she's getting better. What about the fact that it was prescribed for her and she underwent it? In fact, there's some evidence she was even considered for, I believe, electroshock therapy. That's something that we don't... I mean, a long time, we've been almost... Well, anyway, it was a time when people, there was, you know, lobotomies and electroshock and all those things, the forces we've gotten through. But that's the level of depression that you can consider words like that, electroshock therapy, TMS. This is not your average depression case. You treat it like, well, some days she was okay. She could shop, she could take care. That's what you press on. We do a lot of times, you know, as a parent, and as a whatever, we do a lot of things that we could be in incredible grief and going through incredible emotions and grief, but yet you press through. But at some point, you know, she sort of... But what is that evidence that she... Are you saying that she was just, they just gave her TMS and this was a normal run of the mill and that's fine and she's doing better? No, Your Honor, I'm not suggesting that it was just a run of the mill kind of treatment. But TMS is safe, effective, outpatient. It's something that was very, very effective. On page 509 to 511, Ms. Cannon taught, that's where the summary of her TMS treatment records is. And she repeatedly told her providers that she was feeling, she was so happy she tried TMS. She was brighter, she was laughing, she was smiling more. And what's notable about the case is even if, even though TMS was highly effective for Ms. Cannon, she elected not to do a second course of it because she was feeling okay. So that's a testament that she was doing fine with her medication management by Dr. Beal. She chose not to do more TMS treatment. So the ALJ wasn't dismissing the level of treatment or Ms. Cannon's subjective symptoms. What the ALJ was doing was reviewing the record as a whole and adequately accounting for the credibly established limitations by finding Ms. Cannon could only perform a very narrow range of simple work. And I see that my time is up. So if there are no further questions, we'll rest on the brief. Thank you. Thank you. Thank you so much. When do you have a few minutes left? Thank you. I'd like to address just a few issues. And I think the questions from the court or get right to the point here that of why it was so important to have the ALJ give an explanation, which he didn't give regarding these factors, because there's lots of evidence here that calls his conclusions into question. And certainly the nature of the severity of the disease itself and the types of treatment that were provided, which are only provided to long-term, very severe cases, that militates in favor of requiring the ALJ to give a full articulation of all of the factors here, particularly when it's evident that the factors cut in favor of the claimant. The other point that I would like to make has to do with the activities of daily living and the evidence, which the commissioner has really cherry picked out of this record, because the commissioner focuses on the evidence that shows that she did better here or she had this activity or so on, but ignores the fact that maybe a week later or two weeks later, Ms. Cannon is complaining about, well, I'm worse again, or it didn't last. The treatment that I got, the TMS treatment gave me no long-lasting benefit. And that's, as we have argued in our opening brief, this is consistent with the nature of these types of mental illnesses. But with regard to the daily activities and whether Ms. Cannon was functioning well and that that is inconsistent with Dr. Beal's opinion, it's important to look to the agency policy and guidance on how to evaluate this. Some of it comes, and we did not cite this in the brief, but it comes out of the introduction to the mental listed impairments under appendix two, under section 12. And there's a very detailed discussion intended to educate adjudicators on how to look at this evidence. And in particular, it's important to look at how a claimant may appear to be functioning well or at least moderately well after leaving work. But in fact, the reason they appear to be doing well is because they're getting good psychosocial support. They're getting good treatment. The medication has been effective. It's keeping them from deteriorating to the point they have to go back into the hospital, which is the major goal in mental health now, deinstitutionalization, treating people in the community. That's the goal, which Dr. Beal stated was the goal for aggressive treatment, which she did receive. However, the guidance goes on to note that many of these patients will have a relapse if they're put back into a work environment. And so your environment at home, where you have psychosocial support, good medical treatment, and so on, is a factor that has to be considered. So in looking here, for example, about the daily activities, there's no evidence that Ms. Cannon was doing all of these activities that the commissioner has cited on a regular basis for a long period of time. In fact, it looks like she started some and stopped. But if you look at the records from the medical university and the counselor, it is consistently stated that she has good social support at home. And we obviously know she's gotten very extensive medical treatment. A lot of the activities were done with family members in a family context. Once again, the guidance under section 12, subsection D and G speak to this issue and how this evidence should be considered. A lot of the activities had a therapeutic intent. For example, weight loss was a big issue. And that is a classic symptom of depression, according to the commissioner. Getting physical, some physical activity or finding some joy in some activity for a person who's down all the time. All these have therapeutic value. They were done under the direction of a therapist and they were appropriate. They're not signs that she was able to go back into a work environment. I would also point to another guidance, which we did not mention. It did not cite in the brief. And it's in Social Security ruling 85-15. This ruling has to do with assessment under the medical vocational guidelines. But it has a section which is often cited at the administrative level on stress and mental illness. It also emphasizes this fact that even minor job-related stress can send a person with a serious mental illness over the edge. They might appear to be doing well within their safe environment with limited stressors. But put them back in the workforce, they go downhill. And that's a very important part of Dr. Beal's opinion. And yet, once again, the administrative law judge did not see fit. He may have considered it all, but he didn't see fit to explain it. And that is the heart of this case, his failure to follow these regulatory requirements to explain his reasoning. Unless there are other questions, I'll rest on my briefs. Thank you. Thank you, Mr. Domenico. Thank you so much for your arguments. We know they come down and greet you, but we cannot but know very much that we appreciate your arguments in the case and wish you well and be safe with that. I'll ask the deputy clerk to adjourn the court until tomorrow. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Roger L. Gregory, James Andrew Wynn, Henry F. Floyd